

08   CV   11141

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YVETTE FINKELSTEIN, on Behalf of Herself and all Others Similarly Situated, and Derivatively on behalf of AMERICAN MASTERS BROAD MARKET PRIME FUND, L.P., <br><br> Plaintiff, <br><br> v. <br><br> TREMONT GROUP HOLDINGS INC., OPPENHEIMER ACQUISITION CORPORATION, MASSACHUSETTS MUTUAL LIFE INSURANCE CO., and ERNST & YOUNG LLP, <br><br> Defendants, <br><br> and AMERICAN MASTERS BROAD MARKET PRIME FUND, L.P., <br><br> Nominal Defendant. | CIVIL ACTION NO. <br><br> JURY TRIAL DEMANDED <br><br>  |

Plaintiff, Yvette Finkelstein, on behalf of herself and a Class (defined below) and on behalf of the Nominal Defendant (defined below), alleges upon the investigation made by and through her counsel, complaints filed by the United States Government and Securities and Exchange Commission (the "SEC"), reports and interviews published in the financial press and information obtained by plaintiff, as follows:

## I.   SUMMARY OF ACTION

1.      This is both a derivative action brought by a limited partner of American Masters Broad Market Prime Fund, L.P. (the "Fund"), on behalf of the Fund and as a class action on behalf of all persons, other than defendants, who invested with defendants from January 1, 2003

until the present (the "Class Period"), to recover damages caused by defendants' violations of the federal securities laws and common law.

2.     This case arises from a massive, fraudulent scheme perpetrated by Bernard L. Madoff ("Madoff") through his investment firm, Bernard L. Madoff Investment Securities, LLC ("BMIS"), and others, and which was facilitated by defendants named herein, who, recklessly or with gross negligence and/or in breach of fiduciary duties owed to plaintiff and other class members, caused and permitted $3.3 billion – more than half of Tremont Group Holdings, Inc.'s ("Tremont" or the "General Partner") total assets - to be handed over to Madoff to be "invested" for the benefit of plaintiff.  Plaintiff's investments with Tremont were decimated as a direct result of Tremont's reckless or grossly negligent dereliction of its fiduciary duties and the complete failure of Ernst & Young LLP ("E&Y") to perform adequate audits and create its annual audit reports in conformance with generally accepted auditing standards despite the existence of a myriad of "red flags" indicating a high risk to Tremont from concentrating its investment exposure in Madoff.

3.     Throughout the Class Period, Madoff deceived investors by operating a securities business that traded and lost investor money, and then paid certain investors purported returns on investments with the principal received from different investors.  In short, Madoff and his cohorts operated a massive "Ponzi" scheme the likes of which are unparalleled.

4.     On December 10, 2008, Madoff informed certain senior BMIS employees (reported to be his sons) that BMIS' investment advisory business was an utter fraud. Madoff confessed that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." Madoff communicated to the senior employees that for years he paid returns to certain investors out of the principal received from other,

different investors. Madoff stated that the business was insolvent and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion. Published reports now indicate that Madoff's estimate may be on the conservative end of the range once the full effect of the fraud is understood.

5.     On December 11, 2008, SEC and criminal charges were brought against Bernard Madoff. He was arrested and admitted to a Federal Bureau of Investigation Special Agent that "there is no innocent explanation" for BMIS' losses and that he "paid investors with money that wasn't there."

6.     One of Madoff's client's was defendant Tremont, which, unknown to Plaintiff and other class members, concentrated over half of its investment capital with Madoff and BMIS. Investors who entrusted their savings are now ruined. Indeed, scores of charities were destroyed and have either closed their doors or cancelled their proposed grants.

7.     Plaintiff seeks to recover damages caused to the Class by defendants' violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for common law fraud, negligent misrepresentation and breach of fiduciary duty under New York State law. Plaintiff also seeks to recover derivatively for breach of fiduciary duties.

## II.     JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§78j and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, as well as under the laws of the State of Delaware and New York. This Court has jurisdiction in this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. 78aa and pursuant to the supplemental jurisdiction of this Court. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77u, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.     Venue is proper in this judicial district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District. Additionally, defendants maintain their headquarters or conduct substantial business in this District.

10.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.     **PARTIES**

11.     Plaintiff is a Limited Partner in the Fund, and entrusted the Fund to make investment decisions on her behalf. Plaintiff invested at least $925,000 with the Fund and her partnership interest was largely decimated.

12.     Nominal Defendant American Masters Broad Market Prime Fund, L.P., is a Delaware limited investment partnership organized on or about May 23, 1997, and managed by Tremont.

13.     On January 1, 2003, limited partnership interests in the Fund were offered via an Offering Memorandum (defined below). The minimum capital contribution entitling an investor to access to the Fund was $500,000. At that time, the Net Asset Value of the Partnership was approximately $612 million.

14.     Defendant Tremont Group Holdings, Inc. (along with its affiliates Rye Investment Management, Tremont Advisers, Inc., Tremont Partners, which is located at 555 Theodore Fremd Avenue, Rye, New York 10580-1455), is an investment manager in the fund of hedge funds products and multi-manager portfolios.

4

15.     According to its website, "Tremont has been at the forefront in setting the standard in the industry for fund of hedge funds investment management. Effective investment strategies and oversight, thorough manager research, careful due diligence, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23-year span of dedicated strides to maximize our clients' objectives." Tremont is the General Partner of the Fund.

16.     Defendant Oppenheimer Acquisition Corporation ("Oppenheimer") is a business that specializes in investment advisory services.  Oppenheimer's headquarters are located at 2 World Financial Center, New York, New York 10281.  Oppenheimer acquired Tremont in 2001.

17.     Defendant Massachusetts Mutual Life Insurance Co. ("MassMutual"), which is located at 1295 State Street Springfield, Massachusetts 01111-001, is the parent company of Oppenheimer Acquisition Corporation.  MassMutual is a mutually owned financial protection, accumulation and income management company and is a member of FINRA and SIPC.

18.     Defendant Ernst & Young LLP is one of the largest professional services firms in the world and one of the "Big Four" auditors.  E&Y provides assurance and advisory business services, tax services, and consulting for clients worldwide.  E&Y failed to perform its annual audits of the financial statements and financial condition of the Fund in accordance with professional standards applicable to those audits, as described herein.  Defendant E&Y maintains its U.S. headquarters at 5 Times Square, New York, New York, 10036.

19.     Defendants Tremont, Oppenheimer, MassMutual, and E&Y are sometimes referred to herein collectively as the "Defendants."

20.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on clients of Tremont and the fund by their actions.

## IV.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those persons who were clients of Tremont during the Class Period and who suffered damages thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

22.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Members of the Class may be identified from records maintained by the Fund or its General Partner and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

23.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal and state law that is complained of herein.

24.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

25.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

6

     b.    whether statements made by Defendants to its clients during the Class Period misrepresented material facts about the business, operations, and financial condition of the Fund;

     c.    whether Defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

     d.    whether Defendants conduct alleged herein was intentional, reckless, or grossly negligent or in violation of fiduciary duties owed plaintiff and other class members and therefore violated the statutory and common law of New York; and

     e.    to what extent the members of the Class have sustained damages and the proper measure of damages.

26.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.    **PLAINTIFF'S DERIVATIVE ALLEGATIONS**

27.    Plaintiff also brings this action derivatively in the right and for the benefit of the Fund to redress the injuries suffered, and to be suffered, by the Fund as a direct result of the breach of fiduciary duties, abuse of control, gross mismanagement, and negligence alleged herein. The Fund is named as Nominal Defendant solely in a derivative capacity.

28.    Plaintiff will adequately and fairly represent the interest of the Fund and  its limited partners in enforcing and prosecuting its rights.

29.     Plaintiff is a limited partner of the Fund and was a limited partner of the Fund at all times relevant to Defendants' wrongful course of conduct alleged herein.

30.     Plaintiff has not made any demand upon the General Partner to bring an action on behalf of the Fund asserting the claims herein to recover damages for the injuries suffered by the Fund, since such demand would have been a futile, wasteful and useless act, and is therefore excused, for the reasons stated herein:

31.     Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the General Partner and are not subject to the protection of any independent business judgment since it would undoubtedly be to the benefit of the Fund to recover the damages caused by the General Partner's wrongdoing and to assert these derivative claims.

32.     Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by the General Partner to the limited partners and the Fund.  The General Partner is subject to liability for breaching its fiduciary duties to the Fund by, *inter alia*, causing the Fund's assets to be invested with Madoff or Madoff related entities without any oversight or supervision, causing or permitting the reckless investment practices alleged herein, failing to adequately monitor Madoff's financial reporting, and failing to detect, prevent, or halt the misstatements and omissions of material fact alleged herein.

33.     Demand is excused because the General Partner exercises ultimate authority over the Fund and profited at the expense of the Fund by receiving monthly management and administrative fees and other fees from the Fund while in possession of material, adverse, non-public information.

34.     Demand is excused because the General Partner faces a substantial likelihood of liability in this action because of its acts and omissions alleged herein.  The dramatic breakdowns

and gaps in those controls were so widespread and systematic that the General Partner faces substantial exposure to liability, under the "Caremark doctrine," for total abrogation of its duty of oversight. The General Partner either knew or should have known that the Fund's assets were employed as part of a massive Ponzi scheme and took no steps in a good faith effort to prevent or remedy that situation, proximately causing billions of dollars of losses and possible complete collapse of the Fund.

35.     In addition, demand is also excused because the General Partner has ratified the egregious actions outlined herein, and the General Partner cannot be expected to prosecute claims against itself, and persons or entities with whom it has extensive inter-related business, professional and personal entanglements, if Plaintiff demanded that it do so. The General Partner, because of these relationships, has developed debilitating conflicts of interest that prevent it from taking the necessary and proper action on behalf of the Fund.

36.     Demand is also excused because the General Partner participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly or negligently disregarded them, and is therefore not a disinterested party and lacks sufficient independence to exercise business judgment as alleged herein.

37.     Demand is also excused because insurance policies covering the liability of a Fund's General Partner purports to exclude legal claims asserted directly by the Fund against such persons. Thus, there was, and is, a substantial disincentive for the Fund to bring any action directly against the General Partner. Generally, under the terms of such insurance policies, a partnership would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon the General Partner for misconduct and mismanagement. Thus, if the policy or policies which the Fund maintains contain the foregoing

provision, the insurance carriers would argue that the Fund and its General Partner are thereby contractually disabled from complying with any demand that would cause the Fund to institute, or prosecute any action against the General Partner for such misconduct and mismanagement; because to do so could result in the loss to the Fund of its insurance coverage.  Similarly, the Fund would be disabled from pursuing the General Partner, as it would not benefit from any insurance they may have.

38.    Demand is also excused because the General Partner participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly, or negligently disregarded them, and is therefore not a disinterested party and lacks sufficient independence to exercise business judgment as alleged herein.

39.    Given the size, scope, and blatancy of the wrongdoing and the misrepresentations alleged above, the General Partner either knew of the financial risks or turned a blind eye to them.  Such conduct is also not protected by the business judgment rule and exposes the General Partner to a substantial threat of liability in this action.

40.    The General Partner lacks the sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims alleged herein against Defendants.

41.    In addition, demand would be a futile and useless for the additional following reasons:

      (a)    The General Partner, because of its inter-related business, professional and personal relationships, has developed debilitating conflicts of interest that prevent it from taking the necessary and proper action on behalf of the Fund as requested herein;

(b)     The General Partner, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Fund's limited partners or recklessly and/or negligently disregarded the wrongs complained of herein, and is therefore not a disinterested party.   The General Partner exhibited a sustained and systemic failure to fulfill its fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

(c)     In order to bring this suit, the General Partner would be forced to sue itself and persons with whom it has extensive business and personal entanglements, which it will not do, thereby excusing demand;

(d)     The acts complained of constitute violations of the fiduciary duties owed by the General Partner and these acts are incapable of ratification; and

(e)     The Fund has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the General Partner has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for the Fund any part of the damages the Fund suffered and will suffer thereby.

42.     Finally, Plaintiff has not made any demand on the limited partners to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     The Fund has hundreds or thousands of limited partners; and

(b)     Making demand on all the limited partners would force Plaintiff to incur

11

huge expenses, assuming all the limited partners could be individually identified.

43.     The Fund has been directly and substantially injured by reason of the General Partner's intentional breach and/or reckless disregard of its fiduciary duties to the Fund. Plaintiff, as a limited partner and representative of the Fund, seeks damages and other relief for the Fund, in an amount to be proven at trial.

44.     Tremont, as General Partner of the Fund, violated its fiduciary duties to the Fund by failing to act with due care, loyalty and good faith when it either expressly authorized the Fund to conceal its exposure to significant losses due to its investment with Madoff related entities, or in conscious abrogation of its fiduciary duties, permitted it to occur.

## VI.     SUBSTANTIVE ALLEGATIONS

45.     Prior to and during the Class Period, defendant Tremont offered participation in Limited Partnerships in the American Masters Broad Market Prime Fund to qualified investors such as plaintiff. Defendant Tremont is the Funds' General Partner.

46.     Participation was offered primarily through a document called the Amended and Restated Private Placement Memorandum (the "Offering Memorandum"). While the Offering Memorandum may have been amended or revised from time to time, it remained the same in all material respects relevant hereto. Specifically, the Offering Memorandum remained consistent with respect to the material information it concealed. Indeed, neither the Offering Memorandum nor any other offering material used to solicit investments in the Fund disclosed that the majority of the Fund's assets were invested with Madoff, BMIS, or other Madoff controlled entities.

47.     The Offering Memorandum dated January 1, 2003, for example, falsely stated, among other things, that:

12

The Partnership invests primarily in securities through a selected Investment Advisor or Investment Advisors and may also invest through acquisitions of interests in general or limited partnerships, funds, corporations, trusts or other investment vehicles based in the United States that invest or trade in a wide range of securities on a leveraged basis;

The Partnership expects to invest its assets with an Investment Advisor or Investment Advisors specializing in hedged transactions using equities, options trading and short selling; and

Additional Investment Advisors may be utilized in the future, some of which may be investment companies to which the General Partner provides advisory services, and from time to time the General Partner may manage directly the investment of a portion of the Partnership's investment portfolio. The Partnership has the ability to engage new Investment Advisors and to discharge existing Investment Advisors in response to changing market conditions.

48.     These statements were false and misleading and omitted to state that the General Partner, Tremont, abdicated its fiduciary obligations and entrusted Madoff, BMIS and other Madoff related entities with full responsibility and provided no oversight over investment decisions involving more than half of the assets under its control.

49.     The Offering Memorandum also describes defendant Tremont, the General Partner of the Partnership, as "exercising ultimate authority over the Partnership and is involved in the day-to-day management of the Partnership." In stark contrast, Tremont actually gave authority to Madoff and did not have any say in how more than half of the funds it controlled were managed.

50.     According to the Offering Memorandum, Tremont warranted that it remained in a close, supervisory position over its investments advisors. Specifically, the Offering Memorandum stated as follows:

[T]he General Partner is responsible for the day-to-day administration and operation of the Partnership. The General Partner has primary responsibility for monitoring the ongoing

activities of the Investment Advisor or Investment Advisors. The General Partner reviews the confirmations of the Partnership's trading activity for purposes of tracking the current status of the Partnership's accounts. The General Partner has sole responsibility for contacting the Investment Advisor or Investment Advisors regarding trading activity, as well as the sole right to hire or terminate the Investment Advisor or Investment Advisors and distributes quarterly and annual financial reports and all tax information relating to the Partnership necessary for Limited Partners to complete their income tax returns.

51.     The above information from the Offering memorandum was false and misleading because it omitted to state that the General Partner had, with no or inadequate due diligence or oversight, abdicated its responsibility and entrusted the assets of the Partnership to Madoff run vehicles.

52.     In a letter sent to investors on December 14, 2008, Tremont stated, "we believe Tremont exercised appropriate due diligence in connection with the Madoff investments." As described herein, this is untrue.

53.     Defendant Tremont, as the General Partner and Manager of the Partnership, utterly failed to supervise, monitor and manage the investments of the Partnership, in violation of its fiduciary duties under the laws of both New York and Delaware, and contrary to the representations and undertaking that it as the General Partner was exercising ultimate responsibility for the management, operations and investment decisions made on behalf of the Partnership and that notwithstanding potential conflicts of interest, that it and its affiliates were providing investment management services in a manner that is consistent with their respective fiduciary duties to the Partnership.

54.     Defendant Tremont acted with knowledge that it abdicated responsibility for the management of virtually all of the investment assets of the Partnership to Madoff, and with gross negligence in failing to perform or cause to be performed appropriate due diligence that would

have revealed material irregularities in the investments, operations and financial reporting of Madoff.

55.     According to *Bloomberg News*, Tremont "sold Madoff-managed investments since 1997 under the Rye Select Broad Market name, charging 2 percent of assets."

56.     According to published reports in *The New York Times*, Tremont had "$3.3 billion in exposure to the now-collapsed money manager run by Bernard L. Madoff, making it one of the largest 'feeder funds' that steered investors into the scheme."

57.     Yet, Tremont, in breach of its fiduciary duties, failed to conduct even the most rudimentary due diligence on Madoff and instead relied on the "reputation" of Madoff without conducting any investigation of the *bona fides* of Madoff and his operation, and/or an analysis of the trading strategies and investment returns reported by Madoff, which remained suspiciously and consistently high even during adverse market conditions.

58.     Unlike Defendants, other investment advisors who conducted due diligence on Madoff and ran even the most simplistic models testifying the validity of Madoff's results recognized the fraudulent irregularities with Madoff's investments with ease. For example, the financial press reported that Robert Rosenkranz of Acorn Partners, an investment advisor for high net individuals, conducted due diligence on Madoff and found it very likely that the BMIS account statements were generated as part of a fraudulent scheme. Mr. Rosenkranz reached this conclusion based, *inter alia*, on the abnormally stable and high investment returns claimed by Madoff as well the inconsistencies between customer account statements and the audited BMIS financial statements filed with the SEC.

59.     The financial press also reported that, prior to the disclosure of the massive fraud caused by Madoff, Simon Fludgate, head of operational due diligence at Aksia, another advisory

firm, concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC appeared too small to support the size of the assets Madoff claimed to be managing. The likely reason for this was revealed on December 15, 2008, when investigators working at Madoff's offices determined that Madoff was operating a secret, unregistered investment vehicle from his office.

60.     Defendant E&Y also utterly failed to perform its work as auditors of the Fund's annual financial statements in a manner consistent with the standards of the auditing profession and as required by Generally Accepted Auditing Standards ("GAAS").

61.     Defendant E&Y either knew of or recklessly disregarded: (a) the concentration of the Fund's investments in a single third party investment manager, Madoff; (b) the materially heightened risk to Fund's assets from such reliance on Madoff, particularly given the lack of transparency of Madoffs operations; (c) the abnormally high and stable positive investment results reportedly obtained by Madoff, (d) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients such as Tremont and;  (e) the fact that BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

62.     By failing to investigate these clear red flags and the suspicious nature of Madoff's operations and investment results, E&Y's audits of the Fund's financial statements and reports thereon during the Class Period were grossly negligent, in violation of GAAS and constituted an extreme departure from the standards of the accounting and auditing industry. In particular, E&Y has violated GAAS by failing to use due professional care in the performance of its work, AU §230; failing to properly plan the audits, AU §3ll; failing to maintain an appropriate

degree of skepticism during the audits, AU §3l6; and failing to obtain sufficient competent evidential matter to support the conclusions of the audit reports, AU §326.

63.     If E&Y had made an appropriate inquiry underlying these red flags, that investigation would have raised questions regarding the true value and existence of the Fund's reported investment assets and the serious deficiencies in the Partnership's internal controls and adherence to its own policies designed to reduce the risk of loss to the limited partners.

## COUNT I
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 of the Securities and Exchange Commission
### (Against All Defendants)

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     This Count is asserted against all Defendants and is based upon Section l0(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule l0b-5 promulgated thereunder.

66.     During the Class Period, Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase limited partnership investment interests in the Fund.

67.     During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the

17

issuance of, the preparation and issuance of deceptive and materially false and misleading statements to plaintiff and the other class members as particularized above.

68.    In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class relied, to their detriment, on such misleading statements and omissions in purchasing limited partnerships in the Fund. Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proved at trial.

69.    By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiffs and the other members of the Class in connection with their acquisitions of limited partnership interests in the Fund.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act
### (Against Tremont, Oppenheimer, and MassMutual)

70.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.    Defendants Tremont, Oppenheimer, and MassMutual acted as a controlling person of the Fund within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level position, participation in and/or awareness of the Fund's operations, and/or intimate knowledge of the Fund's products, sales, accounting, plans and implementation thereof, they had the power to influence and control and did influence and control, directly or

18

indirectly, the decision-making of the Fund, including the content and dissemination of the various statements that plaintiff contends are false and misleading. Defendants Tremont, Oppenheimer, and MassMutual had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.    Defendants Tremont, Oppenheimer, and MassMutual had direct and supervisory involvement in the day-to-day operations of the Fund and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

73.    By virtue of their position as a controlling person, defendants Tremont, Oppenheimer, and MassMutual are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their acquisitions of limited partnership interests in the Fund.

## COUNT III
### For Violation of Common Law Fraud
### (Against All Defendants)

74.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75.    Plaintiff and other members of the Class in reasonable and justifiable reliance upon the statements and representations made by Defendants, as previously set forth herein, purchased limited partnership investment interests in the Fund. Plaintiff and other members of the Class would not have purchased their limited partnership investment interests in the Fund except for their reliance upon the representations made by Defendants in the Offering Memorandum, and would never have purchased them had they been aware of the material

19

omission and concealment by Defendants of the fact that Tremont, the General Partner had entrusted the entire investment fund and strategy to Madoff.

76.     At the time the statements and representations were made by the Defendants in the Offering Memorandum, the Defendants knew or should have known them to be false, and Defendants intended to deceive plaintiff and other members of the Class by making such statements and representations.

77.     At the time of the false statements, misrepresentations and omissions, set forth above, each of the Defendants intended that plaintiff and other members of the Class would act on the basis of the misrepresentations and omissions contained in the Offering Memorandum in determining whether to purchase limited partnership interests in the Fund.  Plaintiff and other class members reasonably relied thereon to their detriment in making such decisions.

78.     Had plaintiff and other members of the Class known of the material facts that the Defendants wrongfully concealed and misrepresented, and the falsity of the Defendants' representations, plaintiff and other class members would not have purchased their limited partnership investment interests in the Fund.

79.     Plaintiff and other members of the Class, as a result of their purchase of limited partnership investment interests in the Fund and by reasons of the Defendants' wrongful concealments and misrepresentations, have sustained damages, suffered mental and emotional distress and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

80.     By reason of the foregoing, Defendants are jointly and severally liable to plaintiff and other class members.

81. Defendants' fraudulent acts were willful and wanton and plaintiff and other class members are entitled to punitive damages.

**COUNT IV**
**Negligent Misrepresentation**
**(Against All Defendants)**

82. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83. The Defendants owed to plaintiff and other class members a duty: (a) to act with reasonable care in preparing and disseminating the Offering Memorandum and other representations relied upon by plaintiff and other class members in deciding to purchase their limited partnership investment interests in the Fund; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in the Offering Memorandum. Defendant E&Y knew that its audited financial statement reports would be provided to limited partners and potential investors in the Fund and would be relied on by them in making investment decisions concerning the Fund's limited partnership interests.

84. The Defendants breached their duties to plaintiff and other class members by failing to investigate, confirm, prepare and review with reasonable care the information contained in the Offering Memorandum and other representations, including the audited annual financial statements.

85. Neither the Offering Memorandum nor any other offering material used in soliciting investment in the Fund ever disclosed that virtually all of the Fund's assets were invested with Madoff, BMIS or other Madoff controlled entities. As a direct, foreseeable and proximate result of this negligence, plaintiff and other class members have sustained damages, suffered mental and emotional distress and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

21

86.     By reason of the foregoing, Defendants are jointly and severally liable to plaintiff and other class members.

87.     Defendants' fraudulent acts were willful and wanton and plaintiff and other class members are entitled to punitive damages.

## COUNT V
## Breach of Fiduciary Duty
## (Against Tremont)

88.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.     Defendant Tremont has breached its fiduciary duties to the plaintiff and other class members.

90.     As a result of its conduct in abrogating his duties as General Partner to use due care in the management of the assets of the Fund for the benefit of its limited partners, as alleged herein, Defendant Tremont has failed to fulfill its fiduciary duty owed to plaintiff and other members of the class by acting in bad faith, with gross negligence and in utter disregard for due care and reasonable and prudent investment standards.

91.     As a proximate result of Tremont's bad faith breach of fiduciary duty, plaintiff and other class members have sustained damages, suffered mental and emotional distress and have lost most, if not all, of their respective investments in an amount yet to be determined, and to be proven at trial.

92.     By reason of the foregoing, defendant Tremont is liable to plaintiff and other limited partners of the Fund who continue to own their interests in the Fund.

## COUNT VI
### Derivative Claim For Breach of Fiduciary Duty
### (Against Tremont)

93.     The Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

94.     Tremont owed and owes the Fund fiduciary obligations.   By reason of their fiduciary relationships, Tremont owed and owes the Fund the highest obligation of good faith, fair dealing, loyalty and due care.

95.     Tremont violated and breached its fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to the Fund.

96.     As a direct and proximate result of result of Tremont's failure to perform its fiduciary obligations, the Fund has been harmed.  As a result of the misconduct alleged herein, Tremont is liable to the Fund.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  December 22, 2008

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:  _____

Daniel W. Krasner
Gregory Mark Nespole
Demet Basar
Gustavo Bruckner
Russell S. Miness
270 Madison Avenue
New York, NY  10016
Telephone: (212) 545-4600
Facsimile:  (212) 545-4653

/531270

24